UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., AND
SCOOP REAL ESTATE, L.P.,

          Plaintiff,

v.                                     Case No. 8:10-CV-2146-T-17MAP

MARK MASON and CLARISSE MASON,

          Defendants.

_____/

## REPORT AND RECOMMENDATION

      This is one of many cases in this division emanating from a Securities Exchange Commission

enforcement action aimed at dealing with the aftermath of a massive ponzi scheme perpetrated by

Arthur Nadel, a hedge fund manager. *See S.E.C. v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-

26TBM. After the SEC's action and the appointment of Burton Wiand as the Receiver, Nadel pled

guilty in the Southern District of New York to a fifteen count indictment charging him with

securities fraud, mail fraud, and wire fraud surrounding the events precipitating the enforcement

action. The Receiver has sued numerous hedge fund investors, including Mark and Clarisse Mason

("the Masons"), seeking to claw back "false profits" under two theories grounded on the same illegal

scheme the indictment tracks: avoidance of fraudulent transfers under Florida's Uniform Fraudulent

Transfer Act, Fla. Stat. §§ 726.101,*et seq.* ("FUFTA"), and unjust enrichment.[1] Currently, the

---

[1] These types of cases are often called "clawback" actions.

Receiver moves for summary judgment on a precise but critical issue to the determination of this action – Nadel operated the hedge funds and Traders as a ponzi scheme during the distributions of "false profits" to the Masons (*see* doc. 22).  After considering the Masons' response (doc. 47) and the summary judgment record, I find that no material dispute of facts exists and recommend the Receiver's motion for partial summary judgment be granted (doc. 22).   I also recommend the Masons' motion for summary judgment regarding the statute of limitations (doc. 48) be denied, and the Receiver's motion to strike expert McFarland (doc. 54) be denied.

   *A.  Standard of review*

   Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*  477 U.S. 317, 322 (1986).  A court, however, may only consider "that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.,* 433 F.3d 794, 799 (11th Cir. 2005).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor.  *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  While the court does not weigh the evidence or make findings of fact, *see Anderson*, 477 U.S. at 249-50, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Background

This case is one of numerous clawback actions the Receiver has filed in this division. With a few exceptions, all the complaints are alike in their recitals about Nadel, his conduct, and the Receiver's causes of action against a defendant. Any differences are due to the peculiarities of the defendant and the dates and the amounts of the specific distributions made to a defendant. Here, for example, the Receiver alleges the Masons invested $25,000 in Traders Investment Club ("Traders") and received distributions in the amount of $60,673.31.[2] Based on these values, the Receiver seeks to recover "false profits" in the amount of $36,661.31 (the amount received from the scheme in excess of the amounts invested). *See* Complaint, doc. 1, Ex. A. In a number of cases, including this one, the Receiver has moved for partial summary judgment on a discreet factual determination that goes to the heart of his FUFTA claims – that Nadel operated the hedge funds and Traders as a ponzi scheme from their inception. Frankly, the Receiver frames the factual issue more broadly than required. Instead, the case-specific questions should be: Did Nadel operate the hedge funds and Traders as ponzi scheme when he made the distributions to the Masons, and if so, is the evidence so one-sided that the Receiver is entitled to summary judgment on this issue as a matter of law? Before answering those questions, however, it is helpful to understand the events leading up to the Receiver's current partial summary judgment motion and FUFTA's application to a clawback case

---

[2] Nadel created and controlled Traders, an investment club, beginning in 1999. Wiand Decl. ¶¶ 21 (doc. 23); Complaint ¶¶73-77 (doc. 1).

like this one.

### 1. the Receiver's motion

The Receiver's motion is captioned "Receiver's Renewed Omnibus Motion for Partial Summary Judgment." *See* doc. 22.   The Receiver simultaneously filed identical motions in seventeen related clawback cases and, in most of those cases, the motion was preceded by an earlier omnibus motion for partial summary judgment that this Court deferred ruling on in order to allow the parties to conduct further discovery and supplement the summary judgment record.  The renewed omnibus motion presents evidentiary material including: the criminal judgment against Nadel on counts one through and fifteen in the indictment, the restitution order included within that judgment in the amount of $174,930,311.07, the sentencing transcript, the forfeiture order, and the declaration of forensic accountant Maria Yip.  *See* docs. 23-17; 23-18; 23-19; 24 (Yip Decl., March 23, 2012); 31 (Yip Supp Decl., May 11, 2012); 37 (Revision to Yip Decl., July 19, 2012); 56 (Yip Decl., Oct. 11, 2012).  The Receiver supplemented the motion following Nadel's death on April 16, 2012, with Nadel's personal letters and memos which are now appropriate evidentiary considerations for summary judgment purposes as statements against interest and meet the unavailability demands of Fed. R. Evid. 804(a).  *See* doc. 29.

### 2. FUFTA

A vast majority of states have adopted the Uniform Fraudulent Transfer Act (UFTA), an act "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v. Martinez,* 74 F.3d 87, 89 (5th Cir. 1996).  Federal district and bankruptcy courts adopt a largely uniform practice allowing receivers to bring suits under UFTA against ponzi scheme investors to the extent that investors have received payments in excess of the amounts invested and

4

those payments are avoidable as fraudulent transfers.  *Donell v. Kowell,* 533 F.3d 762, 770 (9th Cir. 2008) ("the policy justification is ratable distribution of remaining assets among all defrauded investors").  Hence, the innocent "winners" in a ponzi scheme should not be permitted to "enjoy an advantage over later investors sucked into the ponzi scheme who were not so lucky."  *Id.* citing *In re United Energy Corp.,* 944 F.2d 589, 596 (9th Cir. 1991).

Under Florida's version ("FUFTA") (*see* Fla. Stat. § 726.101, *et seq.*), like other UFTA schemes, a receiver may proceed under two theories, actual fraud or constructive fraud.  *See e.g. Wiand v. Waxenberg,* 611 F.Supp. 2d 1299, 1318-19 (M.D. Fla. 2009); *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (M.D. Fla. 2002).  And in count I, the Receiver proceeds under both of these theories.  Under Fla. Stat. §726.105(1)(a), codifying actual fraud, the Receiver claims the transfers of false profits were fraudulent because Nadel (the debtor) caused the hedge funds and Traders to make the transfers to the Masons as part of a scheme with actual intent to hinder, delay, or defraud creditors of Nadel, the fund managers and/or the hedge funds.[3]  As such, the Receiver alleges a right to repayment of the investors' commingled principal investment money in an amount equivalent to the Masons' false profits from Traders.  The Receiver also proceeds under Fla. Stat.

---

[3]  The Receiver alleges that in light of the right to repayment, the hedge funds have a claim against Nadel and consequently are creditors of Nadel under FUFTA; thus, Nadel is a debtor under FUFTA.   For this case, the Receiver contends that the transfers of false profits to the Masons were inherently fraudulent because they were made as part of Nadel's scheme.  As representative of the receivership entities (the hedge funds and Traders), the Receiver asserts he is entitled to avoid and recover transfers equal to the amount of false profits that Nadel caused the hedge funds and Traders to make to the Masons, and any other pertinent remedy available under Fla. Stat. §726.108, because the money was commingled among hedge funds and Nadel used the hedge funds and Traders as a single, continuous scheme.  *See* doc. 1, ¶¶ 110-114.

§§ 726.105(1)(b) and 726.106(1), for constructive fraud.[4]  *See* doc. 1, ¶¶ 115-118.

Where a debtor engages in a ponzi scheme, proof of a ponzi scheme satisfies UFTA's "actual intent to hinder, delay, or defraud creditors" requirement.  *See Donell, supra,* 533 F.3d at 770-71 citing *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995) (general rule is that to extent innocent investors received payments in excess of amounts of principal originally invested, payments are avoidable as fraudulent transfers); *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009) citing *In re McCarn's Allstate Fin. Inc.,* 326 B.R. 843, 850 (M.D. Fla. 2005) (existence of a ponzi scheme suffices as a matter of law to prove actual intent to defraud for purposes of Fla. Stat. §725.105(1)(a).   To prove a ponzi scheme, the Receiver must establish: (1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.  *Waxenberg, supra,* at 1312.  Here, the Receiver's motion for summary judgment

---

[4]  A transfer is fraudulent under a theory of constructive fraud if the transferor does not receive reasonable value in exchange and the transferor either (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction; (2) intended to, believed, or reasonably should have believed that he or she would incur debts beyond his or her ability to pay them as they became due; or (3) was insolvent at the time of the transfer.  *See* Fla. Stat. §§ 726.105(1)(b)(1)-(2) and 726.106(1).  The Receiver asserts that the transfers were also fraudulent under Fla. Stat. § 726.105(1)(b) because Nadel caused the hedge funds to make those transfers and Nadel, the fund managers, and the hedge funds and Traders were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction, or Nadel intended that he, the fund managers, and/or the hedge funds incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.  Finally, the Receiver asserts that the transfers were fraudulent under Fla. Stat. § 726.106(1) because neither Nadel, the fund managers, nor the hedge funds and Traders received a reasonably equivalent value in exchange for those transfers to the Masons, and Nadel, the fund managers, and the hedge funds and Traders were insolvent at all relevant times.  *See* doc. 1, ¶¶ 115-118.

adopts this ponzi-scheme method to establish that the monies transferred to the Masons were fraudulent transfers in violation of §726.105(1)(a).

Although the Receiver points to the start date of Nadel's scheme as the critical date, the relevant period is the time of the transfers. *In re Old Naples Securities., Inc.,* 343 B.R. 310, 319 (M.D. Fla. 2006) (examining intent at time transfers made when interpreting Fla. Stat. §726.105(1)(a)); *Veigle v. U.S.,* 873 F.Supp. 623 (M.D. Fla. 1994) (determining transferor's intent to defraud at time transfer made for purposes of Fla. Stat. 726.105(1)(a)); *Bay View Estates Corp. v. Southerland,* 154 So. 894 (Fla. 1934) (fraud rests upon debtor's intent at time of the transfer). Hence, whether Nadel operated the hedge funds and Traders as ponzi scheme as early as 1999, as the Receiver proposes, is an unnecessarily broad question to examine. For the Masons, the relevant time is from 2004 through October 7, 2005, the beginning and ending dates of their distributions. *See* doc. 1, ex. A. Accordingly, if the Receiver's ponzi-scheme evidence for this period is one-sided (i.e., the evidence of actual intent to hinder, delay, or defraud creditors is so one-sided), the Receiver is entitled to summary judgment on the issue. *Anderson,* 477 U.S. at 255 (when confronted with a summary judgment motion a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"); *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (same).

   *C.   Discussion*

With the above principles in mind, the summary judgment record overwhelmingly points to the fact that Nadel operated the hedge funds and Traders as a ponzi scheme by the time the Masons

received their two distributions from Traders in 2004 and 2005.[5]  In sum, the Receiver's forensic accountant confirms what Nadel admitted in his criminal proceedings and that court adjudicated. Even when the summary judgment record is viewed in the Masons' favor, the Masons offer little to overcome the Receiver's properly supported motion.[6]

      *1.  an overview of the scheme*

From 1999 through January 2009, Nadel, through Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management"), along with Christopher Moody and Neil Moody, through Valhalla Management, Inc. ("Valhalla Management") and Viking Management, LLC ("Viking Management") (Scoop Capital, Scoop Management, Valhalla Management, Viking Management are collectively the "fund managers") managed certain hedge funds including Valhalla Investment Partners, L.P. ("Valhalla Investment"), Viking Fund, LLC ("Viking Fund"), Victory IRA Fund, LLC ("Viking IRA Fund"), Victory Fund, Ltd. ("Victory Fund"), Victory IRA Fund, LTD ("Victory IRA Fund"), and Scoop Real Estate, LP ("Scoop Real Estate").  And throughout this period, Nadel misrepresented the hedge funds' performance.  By defrauding investors through his control over the fund managers and the hedge funds, Nadel raised over $350 million dollars from hundreds of investors.  While a large majority of hedge fund investors received no distributions of

---

[5]  The Masons deny receiving the 2004 transfer in the amount of $988, but admit to receiving an October 7, 2005, transfer in the amount of $60,673.31.  *See* doc. 14, doc. 69 ex. B and C.

[6]  Once the moving party has satisfied its initial burden under the rule, the nonmoving party must show that a genuine issue of material fact remains and not just some "metaphysical doubt" as to these facts.  *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "A mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment."  *Kesinger v. Herrington,* 381 F.3d 1243, 1249-50 (11th Cir. 2004).

purported profits, or received distributions in amounts less than their investments, a number of investors received hedge fund distributions that exceeded their investments.  The Masons, like some of the other clawback defendants, invested in Traders Investment Club ("Traders"), a purported "investment club" controlled by Nadel.  Although Traders was purportedly independent from the hedge funds, the evidence shows that Nadel commingled money among Traders and the hedge funds, and misrepresented the performance of Traders.   As investment advisor for Traders, Nadel administered all facets of it, and made distributions to existing Traders investors using either money from new investors or money from hedge funds.  In 2005, Nadel purported to "wind up" Traders and distributed remaining assets to investors or as "roll over" directly into investors' hedge fund accounts.

In late 2008 or early 2009, the house of cards crashed.  The SEC filed an emergency action in this division on January 21, 2009, asking for a wide-ranging temporary injunction freezing Nadel's assets, requiring him to provide a sworn accounting, and prohibiting his travel outside the United States.   The district judge quickly granted the request.  *See Securities and Exchange Commission v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM.  Coinciding with these events, a magistrate judge in the Southern District of New York issued a warrant for Nadel's arrest based on a complaint charging Nadel with securities fraud and wire fraud.  At some point during all this (and likely before the enforcement order), Nadel fled.[7]  Eventually, the complaint in the Southern District ripened into a fifteen-count indictment that charged Nadel with securities fraud (counts one through six), mail fraud (count seven), and wire fraud (count eight through fifteen).  Nadel pleaded

---

[7]  All this is in the public record.  Nadel was arrested and appeared in this division for removal proceedings on the Southern District's warrant.  *See United States v. Arthur G. Nadel*, Case No. 8:09-MJ-1039-MAP (doc. 5).

guilty to all the counts, was sentenced to 168 months in confinement, and ordered to pay $174,930,311.07 in restitution (doc. 23-17).  He died in prison on April 16, 2012.

   *2. Yip's analysis*

   The Receiver submits the analysis of his forensic accountant, Maria M. Yip ("Yip"), to support his contention that Nadel operated the hedge funds and Traders as a ponzi scheme.  Yip analyzed records from 29 bank accounts, 24 brokerage and trading accounts, the hedge funds and fund managers' books and records, accounting records of the receivership entities, Advent Software investor accounting system activity, member status reports, tax records for Traders and the receivership entities, and reports prepared by Riverside Financial Group analyzing account activity for brokerage accounts ("the Nadel documents").[8]  Yip opines that from at least December 1999 through January 2009, Nadel through the fund managers managed the hedge funds and grossly misrepresented their performance, and defrauded investors through his control of the hedge funds (Yip Decl. ¶ 25, March 23, 2012).[9]  Yip further opines:

> Based on our review and analysis of the documents, Nadel in combination with Christopher Moody and Neil Moody raised at least $327 million from investors between May 1999 and January 2009.  The money was raised in connection with

---

   [8]  Affidavits such as Yip's have routinely been admitted to demonstrate that an enterprise operated as a ponzi scheme and was consequently insolvent.  *Stenger v. World Harvest Church, Inc.,* 2006 WL 870310, *11 (N.D. Ga. 2006) citing *In re Lake Country Invs.,* 255 B.R. 588, 595-96 (Bankr. N.D. Idaho 2000) (expert affidavit sufficient); *In re Ramirez Rodriguez,* 209 at 431 (expert affidavit sufficient); *In re Colonial Realty Co.,* 209 B.R. 819, 821-22 (Bankr. D. Conn. 1997) (expert affidavit sufficient); *In re Taubman,* 160 B.R. 964, 976-80 (Bankr. S.D. Ohio 1993) (expert affidavit sufficient); *In re Int'l Loan Network, Inc.,* 160 B.R. 1, 7-10 (Bankr. D.D.C. 1993) (expert affidavit and prior judicial decisions sufficient).

   [9]  Yip relied upon a memo/letter of Nadel's dated on or about February 5, 2009, that he provided false gains as early as 1998.  *See* Yip Decl. n.2, March 23, 2012 (citing *U.S. v. Nadel,* U.S. District Court for the Southern District of New York, case no. 1:09-cr-00433-JGK (doc. 71-6)).

more than 700 investor accounts.  The money was raised as part of a single, continuous Ponzi scheme.  Investors received statements ("Investor Statements") on a monthly basis for each of their respective accounts.  These Investor Statements showed purported appreciation and increase in Investor Account balances that were in fact not true.  Providing these fictitious balances not only maintained the investors "in the dark" about the actual performance of these funds but just as important, it served as the basis for the Management Fees that the Fund Managers charged to each of the Investor Accounts.

Yip Decl. ¶¶ 47-50, March 23, 2012; Revision to Yip Decl. ¶8 (revising amount raised from $336 million to $327 million based on further review and analysis), July 19, 2012. Yip's review of the financial records and comparison of balance of principal invested by investors according to the K-1s issued by the hedge funds with the actual balance in the bank, brokerage and trading accounts during the years 1999 through 2008 revealed that Nadel significantly misrepresented the values in the investor accounts and the investor accounts had a fraction of the purported balances (Yip Decl. ¶59, March 23, 2012; Revision to Yip Decl. ¶9, July 19, 2012).  She finds, based on a comprehensive review of the books and records of the hedge funds, that the funds were insolvent as early as 2000 and through and including January 2009 (Yip Decl. ¶82, March 23, 2012; Revision to Yip Decl. ¶10, July 19, 2012).

Yip states that Nadel, in combination with Christopher Moody and Neil Moody, raised $327 million from investors in connection with more than 700 investor accounts between May 1999 and January 2009.  *See* Yip Decl. ¶¶ 47-48, March 23, 2012; Revisions to Yip Decl. ¶8, July 19, 2012. Her report indicates that investors received monthly statements for each of their respective accounts showing purported appreciation and increase in investor account balances that were in fact not true. Yip Decl. ¶ 50, March 23, 2012.  Nadel controlled a number of bank, brokerage, and trading accounts from July 1999 through January 2009, and he transferred money received from investors

among a number of those accounts.  Investor funds were directly deposited into bank accounts maintained at SouthTrust (later acquired by Wachovia), Bank of America, and Northern Trust, and funds from these bank accounts were transferred to brokerage accounts for the purpose of investing the investors' funds.  Yip Decl. ¶¶ 51-53, March 23, 2012.  Funds from these brokerage accounts were transferred back to the Hedge Funds' respective bank accounts to pay management fees based on purported account balances, management fees based on purported profits, and redemptions to investors.  Nadel also transferred funds from these brokerage accounts to other accounts he controlled, including personal bank accounts at Wachovia Bank with names similar to Hedge Fund accounts.  Yip Decl. ¶¶ 55-56, March 23, 2012.  According to Yip, "Nadel created these accounts for two Hedge Funds on whose behalf he did not have authority to act ... [and he] had complete access and control of the funds deposited into these accounts."  Yip Decl. ¶ 56, March 23, 2012.

Yip further declares that Nadel pooled funds received from investors and deposited into accounts, commingled these funds with other investors' money, and transferred the money from those accounts into other bank, brokerage, and trading accounts in which the money was further pooled and commingled with other investors' money.  Yip opines that her review revealed that "Nadel pooled and commingled investors' monies regardless of with which Hedge Fund the monies had been invested; that Nadel not only commingled the monies in these accounts, he would also transfer funds into the brokerage accounts as necessary in order to have sufficient funds from which to pay redemptions; and that these funds would be transferred from the Hedge Fund brokerage account to the Hedge Fund bank account from which the investor would receive his or her redemption."  Yip Decl. ¶ 58, March 23, 2012.

According to Yip, the balances of the principal invested by investors, as reflected by the K-1s

12

issued by the Hedge Funds during the years 1999 through 2002, clearly showed that Nadel significantly misrepresented the values in the investor accounts, which had only a fraction of the purported balances.  Yip Decl. ¶ 59, March 23, 2012; Revisions to Yip Decl. ¶9, July 19, 2012.  *See* Table comparing balance of principal invested compared to actual account balances; Yip Decl. Ex. 59, March 23, 2012, containing balances purportedly in the accounts for the investors at each quarter end during the period of January 2003-December 2008.  For example, according to Advent's investor statements, at the end of the first quarter of 2003 investors had invested a total of $49,363,230 with Nadel and the hedge funds, when in actuality the total balances in the bank, brokerage and trading accounts were $19,987,238.  And, at the end of the fourth quarter of 2008, investors had invested a total of $294,512,345 with Nadel and the hedge funds when in actuality the total balances in the bank, brokerage and trading accounts were $1,338,471.  Yip Decl. ¶ 61, March 23, 2012.

Yip concludes that analysis showed that for each quarter between the first quarter of 2003 and the fourth quarter of 2008, the Hedge Funds always had significantly less money in the financial accounts than the amounts deposited by investors.  Yip Decl. ¶ 64, March 23, 2012.  Moreover, Nadel also controlled Traders, another investment vehicle purportedly operated separately from the hedge funds.  Yip opines that, similar to the hedge funds, Nadel represented to investors that he had achieved high rates of return in order to induce investors to invest.  Yip Decl. ¶ 28, March 23, 2012. Yip reviewed Traders' brokerage statements, Traders' bank statements, yearly federal income tax returns, Partners' Capital Balances statements from Advent and Individual Account Statements, and concluded that Nadel utilized investor principal to pay new investors, and in fact, used investor monies from the hedge funds to pay for Traders' investors' redemptions.  Yip Decl. ¶¶ 65-72, March 23, 2012.  As early as 2003, Traders did not have the assets necessary to pay the amounts represented

as owed to investors, and investor distributions were paid with new investor funds, often from the Hedge Funds. Yip Decl. ¶ 74, March 23, 2012.

Nadel's records, according to Yip, show that Nadel lost more than $23 million over the period of September 1999 through December 2008. Specifically, Scoop Real Estate LP lost $6,637,880; Valhalla Investment Partners lost $3,114,011; Victory Fund Ltd. And Victory Funds IRA Fund lost $4,209,134; and Viking Fund LLC and Viking IRA Fund, LLC lost $9,116,715. Yip Decl. ¶ 78, March 23, 2012. Yip's review did not reveal any other sources of funding for Nadel's hedge funds or fund managers other than a negligible amount from Scoop Real Estate representing less than 1% of the funds. Yip Decl. ¶ 79, March 23, 2012. After a comprehensive review of the books and records of the hedge funds that the funds were insolvent as early as 2000 and through and including January 2009.[10] Revisions to Yip Decl. ¶10 Table, July 19, 2012 (reflecting year end insolvency for years 2000-2002). *See also* Revisions to Yip Decl. Ex. 61 (Revised), July 19, 2012 (providing quarterly information reflecting insolvency during period of 2003-2008).

Yip's concluding opinions are:

1. In order for Nadel to sustain his investment operations, he required a continuous infusion of contributions from his investors. The infusion of new funds

---

[10] Yip defined solvency as "an entity that has sufficient current assets to meet or exceed current liabilities." She defined insolvency to the extent that "liabilities exceed the assets of the entity and its ability to meet these obligations." The books and records reviewed included bank statements, check copies, cancelled checks, wire transfer documentation, deposit slip, deposit confirmations, tax returns filed by the Hedge Funds, QuickBooks records and information maintained on the Advent system. Yip additionally reviewed correspondence in which Nadel admitted to: using all of our liquid assets to cover redemptions and withdrawals, nothing is left." in a letter to his wife, Peg. The assets were calculated based on detailed analysis of actual balances in each bank and brokerage accounts as well as other assets recorded by the Hedge Funds in its QuickBooks records. The liabilities were calculated as the obligations to the investors for the principal they had invested and liabilities recorded by the Hedge Funds in its QuickBooks records. Yip Decl. ¶¶ 80-81, 83-86, March 23, 2012.

into his operation from new and existing investors allowed Nadel to meet the initial investors' request for redemptions.  With the exception of the *de minimus* rental income that was generated, there is no indication of any other sources of income that Nadel could have used to pay the existing investors.

2.  Nadel created the classic Ponzi scheme by paying existing investors with deposits from new and existing investors.  In my opinion, based on the extensive information that I have reviewed, it is evident that the combination of the actual losses coupled with the ever growing management fees (based on inflated balances from purported gains) caused the ultimate collapse of this Ponzi scheme because there was no way for Nadel to meet the investors' redemption requests without the use of new funds from existing investors and funds from new investors.

3.  Based on my analysis of the information that we reviewed, it is clear that Nadel operated a Ponzi scheme through Hedge Funds and Fund Managers from at least May 1999 through January 2009, when the funds collapsed.

4.  The Hedge Funds were insolvent as early as 2000 through and including January 2009, when the funds collapsed.

5.  Traders' raised funds from investors beginning as early as May 1999, paid out Management Fees on purported profits yet did not have trading activity until July 2003.

6.  Similar to the Hedge Funds, Traders also operated as a Ponzi scheme misrepresenting purported profits to investors and using the monies of new investments from existing investors or monies from new investors to meet the redemption of existing investors, in furtherance of Nadel's Ponzi scheme.

Yip Decl. ¶¶87-92, March 23, 2012.   In her revisions to her declaration, Yip further stated that:

Pursuant to a review of bank statements, cancelled checks, wire information, deposit slips, copies of checks, QuickBooks files, federal tax returns, Advent software information, and investor files maintained by the Hedge Funds, the investors of the Hedge Funds and Traders incurred losses in excess of $168 million.

Revision to Yip Decl. ¶12, Ex. B (schedule of gains and losses for each investor account), July 19,

2012.

3. *Nadel's criminal proceedings and admission*s

Nadel's admissions, his plea agreement, his testimony at his plea and sentencing hearings,

15

and his criminal judgment are persuasive evidence supporting the Receiver's motion for partial summary judgment.  Nadel's guilty plea is appropriate for summary judgment consideration either under Fed. R. Evid 807 or as a declaration or deposition for purposes of Rule 56(c) and carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition). *See generally In re Rothstein,* 2010 WL 5173796 (S.D. Fla. Dec. 14, 2010) ("[c]riminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent" and "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions"); *LaBella v. Bains,* 2012 WL 1976972 (S.D. Cal. May 31, 2012) (granting summary judgment for receiver against multiple defendants where court took judicial notice of ponzi schemer's guilty plea agreement and found that he operated a ponzi scheme with actual intent to defraud creditors under UFTA); *In re Madoff,* 445 B.R. 206 (S.D. N.Y 2011) quoting *In re Slatkin, supra,* 525 F3d at 814 ("A debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent ... as a matter of law"); *Armstrong v. Collins,* 2010 WL 1131158 (S.D. N.Y March 24, 2010 (finding schemer who defrauded investors ran a ponzi scheme and that the entities involved were never solvent based on schemer's testimony, his guilty plea and expert opinion).  *See also In re McCarn's Allstate Finance, Inc.,* 326 B.R. 843, 851 (M.D. Fla. 2005) ("Even if the information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish

that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme.").

When Nadel entered pleas of guilty to all the indictment's counts, he acknowledged, under oath, his understanding of the accusations and that a factual basis supported his pleas. *See* doc. 23-15 at 10. Likewise, in his plea agreement, Nadel acknowledged that he was pleading guilty because he was in fact guilty (doc. 23-15). As the Receiver points out, during Nadel's allocution, Nadel explained:

> Beginning in about 2002 and continuing to January 2009, I engaged in knowingly and willfully fraudulent activity for the purpose of obtaining money from investors in the funds and converting the investors; money to my own use. To do so, I fabricated inflated rates of return from my trading activities and fabricated the net asset value of each of the funds. Using these fabricated numbers, I repeatedly communicated to investors and prospective investors that the funds had consistent and extremely positive performances and rates of return and that the net asset value of each of the funds was in the tens of millions of dollars. These communications were knowingly and willfully made false and made for the purpose of inducing investors to invest and keep their money in the funds.[11]

*See* Guilty Plea Transcript, doc. 23-15, at 30. Nadel further stated that he directed his broker to make certain wire transfers among accounts that he controlled "for the purpose of facilitating and concealing the scheme to defraud . . . ." *Id.* at 31.

At the sentencing hearing, Nadel spoke of his "victims" and clearly acknowledged his guilt:

---

[11]   Although Nadel's sworn statements are obvious evidence that he operated the hedge funds as a ponzi scheme by the time of the applicable distributions here, Nadel's temporal recollection is self-serving and contradicted by the record in the criminal case. For example, the sentencing-guideline loss calculation dated back to 1999, a fact that Nadel did not object to at his sentencing proceeding. And at other times discussed *infra,* Nadel acknowledged he "doctor[ed]" continuing losses for more than 10 years and that the hedge fund losses could be calculated by going back to 1998.

I have had almost two years to think about the victims in my case.  I have pictured myself in their position while visualizing the faces and hearing the voices of those I knew personally.  Recently I read their letters over and over again, until their anger and outrage became mine at myself.  I experienced a steep dissent into regret and remorse followed by sorrow and self-hatred, into a deep depression.  It took great effort to struggle out of it.

I spend most of my time in examination of my life not to excuse but to try to understand my harmful past behavior.  I blame no one but myself for my acts and observe that I have been my own worst enemy.  In effect, I have thrown away everything I have lived for: Family, friends, social acceptance, and honor, a sense of self-worth and accomplishment, all my possessions and, finally, freedom itself.

*See* Sentencing Transcript, doc. 23-18, pp.15:23-16:12.  Nadel did not object to the restitution amount, nor did he object to those victims identified in his presentence report and included in his judgment.  Similarly, when the court advised Nadel of the forfeiture calculation, $162 million, his counsel represented that he had no objection.  *See* Preliminary Order of Forfeiture (doc. 62-19), and Sentencing Hearing Transcript (doc. 23-18).  The court sentenced Nadel to 168 months of imprisonment.  *See* Judgment (doc. 23-17).  Nadel's plea agreement, his sworn admissions, his guilty plea, his failure to object to the court's restitution and forfeiture calculations (both premised on his scheme spanning from 1999 to 2009), and court's judgment support Yip's findings.[12]

Nadel's own statements further support the Receiver's motion.  In a January 2009 letter found in a hedge fund office shredder by a Scoop Management employee ("Shredded Letter"), Nadel admitted that "[f]or more than ten [years], I have truly believed that [I could] trade my way out of this mess, and [only] in 2008 did it finally penetrate my addled [brain] that this is not to be.  I have managed to ruin hundreds of lives, and I deserve whatever [I] ultimately receive."  Nadel also sent

---

[12] Nadel's failure to object to probation officer's loss calculation in the presentence report admits its factual accuracy.  *See United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989). This restitution amount (almost $175 million) corresponded with losses to victims from 1999 to 2009.

18

a letter to his family after he disappeared in January 2009 admitting that he had been attempting to

"'doctor' continuing losses for almost 10 years."  In the letter, Nadel suggested that the hedge funds

losses could be calculated by "go[ing] back as far as possible, to 1998 if we can, to Spear, Leads &

Kellogg from Goldman, Sachs, and determine the actual trading losses."  He stated that his

"recollection of the more recent losses, say from 2001 on, is about an average of $20 million per

year. ..."  Nadel wrote a confidential memo that provided a background of himself and the hedge

funds, including the operation of the investment clubs before the formation of the hedge funds.  In

the confidential memo, Nadel wrote:

> All six [hedge funds] were traded together as a group usually ... [B]y 1999 the
> volatile tech bubble created losses.  When the bubble burst I began to "doctor" the
> trading results.  It started in a small way, but as the assets increased, it became more
> difficult to cover the losses, and then came 9/11/2001, followed by the recession of
> 2002.  All of this time, I believed that I could trade my way out of the discrepancies
> between the stated assets and the actual assets.

doc. 30-4; *see also* 30-2, 30-3.[13]

### 4. The Masons' rebuttal

In response to this overwhelming evidence, the Masons offer little rebuttal evidence in

admissible form.  *See Celotex Corp.,* 477 U.S. at 324 (1986) (if the moving party makes the required

showing, the burden shifts to the non-moving party to rebut that showing by producing counter-

evidence in admissible form).  *See* doc. 47.  Initially, the Masons argue that the Receiver's motion

for partial summary judgment makes a sweeping conclusion that a ponzi scheme is established while

Nadel's plea and other statements actually disprove that he ran a ponzi scheme.  According to the

Masons, that Nadel's plea fails to articulate that he ran a ponzi scheme and that Nadel has not signed

---

[13]  Given Nadel's recent death, all these statements are admissible per Fed.R.Evid.
804(b)(3)(A) or 807.

an affidavit admitting to a ponzi scheme despite Nadel's cooperation with the Receiver and his attorneys to assist in recovering funds from receivership investors, shows that the elements of a ponzi scheme must be lacking. This argument is unpersuasive, however, and I have already addressed that the evidentiary record supports a finding that Nadel ran the hedge funds and Traders as a ponzi scheme. *See §C. Discussion, supra; In re McCarn's, supra,* 326 B.R. at 851 ("Even if the information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme."). The Masons point out that although the Receiver asserts that the ponzi scheme began in 1999, Nadel admitted to fraud beginning in 2002 during his plea and that Nadel conducted a legitimate business operation in which substantial profits were made, disproving a ponzi scheme. Given that the relevant time frame in this case is 2004 through October 7, 2005, the Masons' argument is self-defeating.

Undoubtedly, Nadel did trade. He also commingled funds, purposely misrepresented his earnings and losses, and applied the influx of new investors' moneys to pay off old investors and further the scheme. The legitimacy of some trading activity does not wipe clean the overarching illegitimacy of the scheme. The only evidence before me shows that Nadel operated the hedge funds such that little or no legitimate business was conducted, the hedge funds produced little or no profits or earnings, and the transfers to investors was from cash infused by new investors, thus satisfying the elements needed to prove a ponzi scheme.

The Masons cite to Nadel's statements about his belief that he could "trade his way out" and that his fraud started in a small way with moderate profits made at first, attempting to show that at

least in the earlier years Nadel conducted some legitimate business.  However, Nadel's self-serving statements are inadmissible as they are not statements against interest.  Fed.R.Evid. 804(b)(3); *Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999) (the general rule is that inadmissible evidence cannot be considered for summary judgment purposes).  *See also Scholes,* 56 F.3d at 762 (ponzi schemer's backpedaling statements made in affidavit were appropriately rejected for summary purposes as schemer should not be able to retract admissions made in plea agreement and guilty plea which bind a party and have greater veracity safeguards)*; Ciccarelli v. Gichner Systems Group, Inc.,* 862 F.Supp. 1293 (M.D. Penn. 1994) citing *Williamson v. United States,* 512 U.S. 594 (1994) (for purposes of summary judgment motions, court would consider only those portions of now deceased affiant's statements that were against his interest and would not consider collateral portions as they lack "same indicia of reliability" as portions covered by Rule 804(b)(3)).  More relevant are the sworn statements Nadel made in his criminal proceedings and his statements against interest, and Nadel's failure to object to the forfeiture and restitution calculations that were based upon losses from 1999 forward, all of which support the conclusion that by 2004 (when the Masons received their earliest distribution), Nadel was working a ponzi scheme.

Next, the Masons contend Yip's declaration is unreliable because she has "no expertise" in relation to hedge funds, she fails to prove a ponzi scheme, and their expert (Harold McFarland) contradicts her opinions.  As for Yip, the Masons level a host of complaints: she does not know the difference between a legitimate operation of hedge funds versus a ponzi scheme operation; she improperly relied on unverified findings of the third party analyst the Receiver retained; she unjustifiably excluded pertinent evidence; and she incorrectly concluded that Nadel conducted "little or no legitimate business operations" and earned  "little or no profits," although she acknowledged

Nadel made trade profits from 2002 to 2005.   But as Yip reports, trading profits alone are not sufficient evidence to reach a conclusion regarding whether or not the hedge funds operated as a ponzi scheme.   Yip explains that "[a]lthough the Hedge Funds had net trading profits during 2002-2005, the same Hedge Funds paid out in excess of $36 million to its Fund Managers based on inflated trading profits and fictitious net asset values."   *See* Yip Decl. ¶¶26-27, Oct. 11, 2012.

The Masons' expert, McFarland, who is a certified CPA, does not alter the quantum of proof the Receiver puts forth (doc. 47-8).   Indeed, the bases of his opinions are suspect.[14]   For example, he admits that he conducted only a partial, incomplete analysis, had not reviewed certain relevant documents, and did not consider whether Nadel had made any misrepresentations to the hedge fund investors.   *See* McFarland Dep. 72:19-73:17, 127:24-128:6 (docs. 55-2 and 55-3) (McFarland testified that he "really had not done the analysis" to determine when he first saw traits of a ponzi scheme because he had only analyzed the first three years of Traders and had not examined "the other ones").   A number of clawback defendants have used McFarland, and his opinions have varied and are sometimes contradictory.   For instance, regarding the Masons, McFarland expresses "significant doubt as to whether these hedge funds were in fact a Ponzi-scheme from the beginning or simply a legitimate business enterprise that at some point became a Ponzi-scheme.   While the Commission found it to be a Ponzi-scheme from 2008, there is insufficient information to determine when exactly, or if, it became a Ponzi-scheme before that."   *See* McFarland Rpt. ¶ A(10).   This contrasts with his declaration in *Rowe* where he opines "there is sufficient evidence to determine that these entities compromised an elaborate Ponzi scheme some time during or after 2006 … [and] there are some artifacts of a Ponzi scheme as early as 2003."   *See* McFarland Decl. ¶¶ C(1-2) (*Wiand v.*

---

[14]   The Receiver has moved to strike McFarland's opinions (doc. 54).

*Rowe,* case no. 8:10-cv-245, doc. 70). He goes on in *Rowe*: "At best, the only thing that can be said with complete confidence is that the evidence is conclusive that Nadel-Moody was insolvent and a Ponzi scheme from 2006 forward and inconclusive prior to 2005, further it is unlikely that Nadel-Moody was a Ponzi scheme prior to 2002." McFarland Decl. ¶C(4) (*Wiand v. Rowe*, case no. 8:10-cv-245, doc. 70. But then he hedges: *see* McFarland Dep. 62:22-63:12 (*Wiand v. Rowe,* doc. 83-1) ("... the early years, '99 and 2000, 2001, were definitely not a Ponzi scheme. So I don't know when it was. I believe it was from 2006 forward. At this point it's my opinion that it was not in '99, 2000, 2001. It was some time after that. And the strongest evidence is pretty heavy at 2005, or so, it changed [into a Ponzi scheme]. … By the end of 2006, I have no questions that it was a Ponzi scheme."). Further, some of McFarland's criticism of certain aspects of Yip's report are mistaken. For example, he claimed that Yip incorrectly considered the period between 1999 through 2009 as one single unit. But that premise is misplaced. Yip performed a detailed quarterly analysis for each year from 1999 through 2008, and attached no fewer than 62 exhibits demonstrating her thorough analysis of financial statements. *See* Yip Decl. ¶¶ 59-60, 82, Ex. 6-61, March 23, 2012; Yip Decl. ¶¶ 25-31, Oct. 11, 2012.

That the Masons proffer McFarland's report does not mean summary judgment is automatically inappropriate. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) quoting *Merit Motors, Inc. v. Chrysler Corp.* 569 F.2d 666, 672-73 (D.C. Cir. 1977) ("Rule 703 was intended to broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue, to make summary judgment impossible whenever a party has produced an expert to support its position."); *see also American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985) (finding trial court properly awarded summary judgment for defendant and did not err in

assigning "little weight" to plaintiff's expert's affidavits because the affidavits did not create a material issue of disputed fact); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1999) (Expert opinions can defeat summary judgment only if they show "a process of reasoning beginning from a firm foundation.").  In the end, the operative guides are Rule 56(a), (c), and (e), and against these standards, the record overwhelming supports the Receiver's position that Nadel operated the hedge funds and Traders as a ponzi scheme at least by 2004, when the Masons received their first distribution.[15]

### 5. the Masons' partial summary judgment motion

The Masons filed a motion for partial summary judgment seeking entry of an order finding certain of the Receiver's constructive fraud FUFTA claims barred by the statute of limitations (doc. 48).  In light of my finding here that the transfers to the Masons are avoidable under the actual fraud cause of action spelled out in Fla. Stat. §726.105(1)(a), I need not determine whether any of the transfers were constructively fraudulent.  And, I need not determine whether any of the Receiver's constructive fraud claims are barred by the statute of limitations.

The Masons also seek summary judgment regarding the Receiver's claims arising from transfers from Traders, asserting these transfers are time-barred by the statute of limitations because the Receiver waited well beyond the one-year statute of limitations period to file this cause of action. I find the Masons' argument unavailing for two reasons.  First, as set forth by the Receiver, the complaint was filed less than one year after the Receiver was appointed as receiver of Traders.  The Receiver was appointed as receiver for Traders on August 9, 2010, and the one-year discovery

---

[15]  Because I find that Nadel, through the hedge funds and Traders, operated a ponzi scheme, it is unnecessary to address the Masons' assertion that Nadel's statements do not prove a blanket FUFTA violation.

limitations period runs from that date.   *See S.E.C. v. Nadel,* case no. 8:09-cv-87-T-26TBM

(M.D.Fla.) (doc. 454).   The complaint, filed on September 27, 2010, was within one year of the

Receiver's appointment as receiver for Traders, and thus, the Receiver's claims seeking recovery

under Fla. Stat. §726.105(1)(a) for the Traders transfers are not barred by the statute of limitations.

While Nadel controlled Traders and the hedge funds, the scheme and fraudulent transfers were

concealed and could not reasonably have been discovered as a matter of law.   *See Scholes, supra,*

56 F.3d at 754-55; *In re Blackburn,* 209 B.R. 4, 13 (M.D. Fla. 1997) (statute of limitation tolled until

appointment of receiver); *Wing v. Kendrick,* 2009 WL 1362383, *3 (D.Utah 2009) (claims filed

within one year of receiver's appointment not time-barred under UFTA because "fraudulent nature

of the transfers [could] only be discovered once the Ponzi operator ha[d] been removed from the

scene").

Second, I find that the claims arising from the Traders transfers to the Masons were asserted

within one year after the Receiver discovered or could reasonably have discovered them.   Though

the Masons claim the Receiver could have reasonably discovered the Traders transfer the day he was

appointed, they cite to no specific records or documents to support their bare assertion.   The only

record evidence reveals that immediately upon his appointment as Receiver for the hedge funds in

2009, the Receiver began to subpoena documents from non-parties and it was not until February 3,

2010, that non-party Wachovia Bank, which held the lone Traders bank account, produced

documents relating to Traders providing the Receiver with the requisite proof to determine who

received the Traders transfers and that they were fraudulent.   *See* doc. 69 at 9-10; Wiand Decl. ¶¶

7-11, 13-28.   Following analysis by accounting experts, the Receiver concluded that Nadel had

treated Traders as part of his scheme and commingled money raised from Traders investors with

hedge fund monies, and moved to include Traders into the receivership entities on August 9, 2010.

Thereafter, the Receiver filed this action against the Masons.

6. *false profits*

The Receiver posits that the Masons, like other investors, experienced a net gain or "false

profits." Per the Receiver, the Masons deposited $25,000 in Traders in 2002, and received

distributions totaling $60,673.31 ($988 in 2004, and $60,673.31 on October 7, 2005) from Traders.

*See* Complaint, doc. 1, Ex. A. Hence, the Receiver calculates the Masons' "false profits" amount

to $36,661.31 (the amount received from the scheme in excess of the amounts invested). In response

to discovery propounded by the Receiver, the Masons admitted receiving the $60,673.31 distribution

on October 7, 2005, but denied receiving the $988 transfer in 2004. *See* doc. 69-2 and 69-3

(Masons' responses to Receiver's request for admissions). And in their *pro se* "response" to the

Complaint, the Masons disputed the Receiver's false profits calculations, claiming the calculations

did not include a $55,000 transfer to the Mason Family Trust, LLLP's Valhalla Investment Partners

account in October 2005. *See* doc. 14 (Masons' *pro se* response to Complaint). It seems the Masons

argue that the Court should permit them to off-set the $55,000 loss incurred by the Mason Family

LLLP against the false profits they received from their own investments at issue in this case.

However, as the Receiver points out, the Receiver filed a separate action against the Mason Family

LLLP and related parties for return of false profits. *See Wiand v. Mason Family LLLP, et al.*, case

no. 8:10-cv-219-T-17MAP. Per the Receiver, the parties in the *Mason Family LLLP* case reached

a settlement agreement, wherein the defendants admitted to receiving $253,274.71 in false profits

from Nadel's scheme, including $15,149.71 in false profits to the Mason Family LLLP. *See S.E.C.*

*v. Arthur Nadel et al.,* case no. 809-cv-87-T-26TBM, doc. 571. The Receiver posits that because

the Mason Family LLLP did not suffer a loss, the Masons have no basis to offset the false profits

sought in this case.  And, according to the Receiver, even if the Masons are owed distributions from

the Mason Family LLLP arising from investments in Traders or the hedge funds, their legal recourse

is against the Mason Family LLLP, and not against the receivership entities or the Receiver. *See* doc.

69 at n.3, Receiver's response to Masons' motion for partial summary judgment.

The above-described issue is not before the Court by way of either the Receiver's motion for

partial summary judgment (doc. 22) or the Mason's motion for summary judgment regarding the

statute of limitations.  The facts concerning the related *Mason Family LLLP* litigation and settlement

do not seem in dispute, but given that the Receiver raised this issue in his response (doc. 69) to the

Masons' motion for partial summary judgment regarding the statute of limitations, and that it is

almost akin to a summary judgment motion, the Masons should be allowed to submit a reply to show

cause why this Court should not adopt the Receiver's calculations of false profits ($36,661.31).  The

Masons should also address the issue of whether any set-off of the false profits is appropriate in light

of the facts set forth by the Receiver.[16]

*D. Conclusion*

As one court recently noted:

Ponzi schemes leave no true winners once the scheme collapses.  In recognition of
that unpleasant reality, courts adhere to the 'principle that equality is equity' in
dealing with the aftermath of an imploded Ponzi scheme.

---

[16]   Local Rule 3.01(c) prohibited the Masons from issuing a reply without first obtaining
leave of court.  And even if the Receiver's response were not tantamount to a summary judgment
motion, the Court could not grant summary judgment *sua sponte* without first giving notice to the
parties that the Court intended to address the matter. *Moton v. Cowart*, 631 F.3d 1337, 1343
(11th Cir. 2011).

*Janvey v. Democratic Senatorial Campaign Comm., Inc. et al.,* 793 F.Supp. 2d 825, 858 (N.D. Texas 2011) citing *Donell, supra,* 533 F.3d at 779.  Upon consideration of the evidence before me, I find that Nadel operated the hedge funds and Traders as a ponzi scheme at the time of the transfers to the Masons and that the transfers to the Masons were made with the actual intent to hinder, delay, or defraud as required by Fla. Stat. § 726.105(1)(a).  For the reasons given, it is hereby

RECOMMENDED:

1.  That the Receiver's motion for partial summary judgment (doc. 22) be GRANTED to the extent that Nadel operated the hedge funds as a ponzi scheme at the time of the transfers to the Masons, and that the transfers to the Masons were made with the actual intent to hinder, delay, or defraud as required by Fla. Stat. § 726.105(1)(a).  Though I find the transfers to the Masons avoidable under FUFTA, the Masons should be given 14 days to show cause why the Court should not award false profits in the amount of $36,661.31, and present any reasons why set-off is appropriate given the facts set forth regarding the related litigation and settlement set forth by the Receiver in doc. 69.

2.  That the Receiver's motion to strike report of Defendants' designated expert, Harold McFarland, and to Preclude His Testimony at Trial (doc. 54) be DENIED.

4.  That the Masons' motion for summary judgment relating to statute of limitations (doc. 48) be DENIED.

5.  That all pending motions be denied and the Clerk directed to close the case.

IT IS SO REPORTED at Tampa, Florida on December 17, 2012.

*Mark A. Pizzo*

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

28

## <u>NOTICE TO PARTIES</u>

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:    Hon. Elizabeth A. Kovachevich
        Counsel of Record